COPY

EXHIBIT A

DIANA ZALESKI
2006 SEP 29 PM 3:26
SUMMIT COUNTY
CLERK OF COURTS

IN THE COURT OF COMMON PLEAS
FOR SUMMIT COUNTY, OHIO

TOY FRIEDBERG
The Crescent
107 North Brayford Court
Bluffton, SC 29910-6263,

Plaintiff,

vs.

A. SCHULMAN, INC.
c/o Paul F. DeSantis, its
Statutory Agent
3550 West Market Street
Akron, Ohio 44333

CASE NO. 2006 09 6202

ASSIGNED TO JUDGE SHAPIRO

JUDGE

**COMPLAINT**

(Jury Demand Endorsed Hereon)

Now comes Plaintiff, Toy Friedberg, by and through her attorneys, and for her claims against Defendant A. Schulman, Inc., hereby states as follows:

## THE PARTIES

1. Plaintiff Toy Friedberg is a citizen of the State of South Carolina residing at 107 North Brayford Court, Bluffton, South Carolina.

2. Defendant A. Schulman, Inc. (hereinafter, "Schulman" or the "Company") is a Delaware corporation with its principal place of business at 3550 West Market Street, Akron, Ohio.

## JURISDICTION AND VENUE

3. The claims arose in this County. Defendant Schulman has its principal place of business in this County, and is subject to personal jurisdiction in this County.

COPY



4. Venue in this Court is therefore proper.

## STATEMENT OF APPLICABLE FACTS

### Ethics Point Allegation No. 15

5. In approximately 1992, Plaintiff Friedberg became the Human Resources Director, North America, for Schulman.

6. Plaintiff Friedberg served ably and competently in the position, and her annual performance reviews reflected this.

7. In 2002, the Sarbanes-Oxley Act (Pub. L. No. 107-204, 116 Stat. 745, also known as the Public Company Accounting Reform and Investor Protection Act of 2002 and commonly called SOX or SarbOx; July 30, 2002) was passed (hereinafter, "Sarbanes-Oxley").

8. Sarbanes Oxley is a federal law passed in response to a number of major corporate and accounting scandals, including those affecting Enron, Tyco International and WorldCom. These scandals resulted in a decline of public trust in accounting and reporting practices.

9. The legislation is wide ranging and established new or enhanced standards for all U.S. public company Boards, management, and public accounting firms.

10. The signing officers must certify that they are "responsible for establishing and maintaining internal controls" and "have designed such internal controls to ensure that material information relating to the company and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared." 15 U.S.C. § 7241(a)(4).

11. Pursuant to the requirements imposed upon it by Sarbanes-Oxley, Schulman established an Ethics Hotline, a mechanism by which employees and non-employees of the Company could anonymously report perceived ethics violations.

12. Specifically, phone numbers were established in 16 countries in which Schulman operated to which employees and non-employees could anonymously phone in any alleged ethics violations to an independent third-party consultant, EthicsPoint.

13. EthicsPoint would then translate the allegations into English, if necessary, and forward them in a secure e-mail to the Chair of Schulman's Audit Committee, Ernest J. Novak, and to Plaintiff Friedberg, who had been named the EthicsPoint Hotline Investigator for Schulman.

14. At that point, Mr. Novak would determine which officer was most appropriate to apprise of the allegation and advise him or her of same.

15. Plaintiff Friedberg would then conduct an investigation, which included interviews with individuals in the Company most likely having knowledge, or alleged to have knowledge, of the claimed violation.

16. In the first several months the Ethics Hotline was in service, fourteen allegations were received, investigated and resolved by Ms. Friedberg.

17. As to those fourteen allegations and investigations, not once did anyone at the Company ever lodge a complaint with Ms. Friedberg as to the manner in which the investigations were undertaken and completed.

18. Indeed, Mr. Novak made a point of complimenting Ms. Friedberg's investigations and reporting to Robert A. Stefanko, then the Chairman of the Board and





Chief Financial Officer of Schulman, who was Ms. Friedberg's supervisor during her employment at Schulman

**The Receipt of Allegation 15**

19. On or about March 5, 2006, a fifteenth allegation was made to the Ethics Hotline ("Allegation 15").

20. In this instance, the caller to the EthicsPoint Hotline alleged that Gary J. Elek, Vice President, Corporate Controller and Secretary of Schulman, had repeatedly been coming back from lunch intoxicated.

21. Mr. Elek had been hired into the Company on February 2, 2004 as a direct report to Robert A. Stefanko, then the Chief Financial Officer of Schulman, and was responsible for financial and accounting reporting, including Sarbanes Oxley matters.

22. Mr. Elek had previously been a Vice President – Business Development for FirstMerit Bank, on whose Board Terry L. Haines, President and CEO of Schulman, sat.

23. Upon information and belief, Mr. Haines and Mr. Elek are social friends who enjoy, among other things, a common interest in playing golf, and Mr. Haines was instrumental in Schulman's hiring of Mr. Elek.

24. Indeed, Mr. Haines by-passed the normal recruiting protocol for Schulman, and Mr. Elek did not to outward appearances meet the minimum hiring qualifications set forth in the job description for the position.

25. Consistent with the preceding fourteen investigations of Ethics Hotline tips, EthicsPoint forwarded Allegation 15 in a secure e-mail to the Chair of Schulman's Audit Committee, Mr. Novak, and to Plaintiff Friedberg.

26. Mr. Novak determined at that time that the appropriate officer to advise of the imminent investigation of Allegation 15 was Mr. Haines.

27. To the extent he had been advised of previous investigations of allegations made to the EthicsPoint Hotline, Mr. Haines had not before seen fit to comment on them prior to a full investigation being conducted.

28. However, when advised of this particular allegation, Mr. Haines sent an e-mail to Ms. Friedberg in which he wrote the following:

> Toy, I had a discussion with Ernie Novak on a report received from Ethics Point concerning a VP and substance abuse. I believe the report is slanderous and without merit.
>
> Just wanted to let you know I received the information from Mr. Novak.

29. Ms. Friedberg responded by indicating that, while she understood this to be a "difficult situation," she nonetheless "plan[ned] to investigate th[e] allegation objectively just as [she had] done with the other reports . . . received to date."

30. Mr. Haines responded by e-mail, stating only, "Toy I agree. TLH."

**The Investigation**

31. Ms. Friedberg then proceeded to conduct the investigation of Allegation 15 in the same manner and following the same protocols as in the prior investigations.

32. As in each of the preceding investigations, interviewees were told that the interviews would be confidential, and that there would be no retaliation.

33. All told, thirteen individuals were interviewed, in addition to the subject of the investigation, Mr. Elek.

34. Of the thirteen individuals interviewed, five individuals indicated that they had observed one or more of the behaviors alleged in the call to the EthicsPoint Hotline.

35. When Ms. Friedberg interviewed Mr. Elek, he told her that Terry Haines already had informed him of the allegations being made against him. This was against protocol for ethics hotline investigations.

36. Mr. Elek denied the allegations, and further indicated his belief that the allegations were the product of someone with "an ax to grind" with him.

37. In the "Summary" section of her March 13, 2006 written report on the investigation of Allegation 15, Ms. Friedberg stated: "While the percentage of individuals who observed some type of irregular behavior is concerning; there are no solid conclusions. This situation does merit further observation."

**Report Presented to Haines**

38. On March 14, 2006, Ms. Friedberg met with Terry Haines to advise him or her decision to retire effective at the end of that month, and also to provide him with, and discuss with him, the report on the investigation into Allegation 15.

39. Ms. Friedberg also provided the report to Mr. Stefanko, the CFO, and Mr. Novak, Chair of the Audit Committee.

40. During the meeting with Mr. Haines, Ms. Friedberg was instructed by him to revise the report by deleting the "Summary" section, which included the conclusions reached (or more accurately, not reached) and the recommendation that the situation continue to be monitored.

41. This was the first time anyone from the Company had instructed Ms. Friedberg to alter any of her ethics hotline investigation reports in any way.

COPY


42. On March 20, 2006 at 5:00 p.m., Mr. Haines left a voicemail for Ms. Friedberg in which he instructed her to give him a "list of the interviewees" to which Ms. Friedberg spoke in regard to the Elek investigation.

43. On or about March 21, 2006, Ms. Friedberg received a follow-up e-mail from Mr. Haines in which he impatiently asked her whether she had received his prior voicemail message requesting the list of interviewees, and reiterating that request.

44. She responded that day by e-mail, with a copy to Mr. Stefanko.

45. First, she noted that she had never had anyone ask her to reveal the names of the interviewees in any of the preceding ethics hotline investigations.

46. She further reminded Mr. Haines that "[p]articipants in all investigations were promised confidentiality and [that] disclosure of the participants would result in lack of cooperation in future investigations."

47. What Ms. Friedberg did not cite to Mr. Haines at the time was the Company's own Code of Conduct, which specified that "all information and documentation rendered [in regard to an ethics hotline investigation] will be maintained in confidence and in a manner that will protect the interests of all reporting parties."

48. Notwithstanding the foregoing, Mr. Haines did not back down. In a responsive e-mail, he wrote that he "strongly feel[s] we may have over reacted, causing great personal embarrassment to a deciated [sic] employee."

49. Mr. Haines further expressed his opinion that "[t]his review will not hamper having a effective hot line but will improve it by protecting employees from untrue accusations."

COPY



50. Mr. Haines demanded that Ms. Friedberg respond to his request for a list of interviewees "asap."

51. A conference call was hastily arranged to discuss the matter – an obvious attempt to intimidate Ms. Friedberg into providing the names of the individuals interviewed.

52. Participating in the call were Terry Haines, Robert Stefanko, Paul DeSantis (who had been hired in January 2006 to replace the soon-to-be-retired Mr. Stefanko as CFO), Ernie Novak and J. Bret Treier, an attorney for Schulman.

53. Notwithstanding Mr. Haines' repeated requests during the course of the conference call, Ms. Friedberg declined to disclose to him the names of the individuals interviewed in regard to the Elek investigation.

**The Retaliation**

54. In her capacity as Human Resources Director – North America, Ms. Friedberg was very familiar with the retirement and separation packages given by the Company in the ordinary course.

55. Based on her knowledge of those packages and the circumstances pursuant to which they were paid, a typical and usual retirement package for an employee of Ms. Friedberg's stature and years of service would have been between six and eight months of salary and bonus.

56. Ms. Friedberg arranged to meet with Mr. Stefanko to discuss what her retirement package would be. The meeting was postponed by Mr. Stefanko several times.

COPY



57. When Ms. Friedberg was finally able to meet with Mr. Stefanko, he first warned her that she was "not going to like this."

58. Mr. Stefanko then told Ms. Friedberg that, after considerable discussion with Mr. Haines, he was able to get her retirement package "up to two months" – the clear implication being that Mr. Haines was inclined to give her even less, and perhaps nothing at all.

59. To make matters worse, Mr. Stefanko said that Ms. Friedberg would not receive the paltry package unless she first agreed to sign an onerous release of the Company and, among others, its directors and officers (including Mr. Haines).

60. Ms. Friedberg was told by Mr. Stefanko that the release was the brainchild of, and had been approved by, Mr. Haines.

61. In Ms. Friedberg's experience as Human Resources Director – North America, no other retirees or resignees of the Company had been required to sign a release in order to obtain their retirement packages.

62. Ms. Friedberg declined to sign the release, Ms. Friedberg did indicate that, if given a retirement package commensurate with her salary structure and years of service to the Company, she would be willing to sign the release.

63. Meanwhile, Ms. Friedberg's retirement date arrived. In a manner wholly inconsistent with the standard practice of the Company, Ms. Friedberg was denied the customary retirement party and retirement gift.

64. Since her retirement, the Company has failed to provide Ms. Friedberg with a retirement package consistent with those given other employees.

COPY



65. Indeed, to this day, Ms. Friedberg has received no retirement package of any sort from the Company. It has now become clear that no such retirement package is forthcoming.

66. It is clear that the Company's failure to provide Ms. Friedberg with a retirement package consistent with those given other employees of her position and years of service is in obvious and unlawful retaliation for, among other things, her refusal to compromise the integrity and confidentiality of the Company's ethics hotline.

**COUNT I**
**UNLAWFUL RETALIATION**

67. Plaintiff incorporates by reference the foregoing paragraphs 1 through 66 as if fully rewritten herein.

68. Plaintiff was engaged, and knowingly, in the protected activity of preserving the confidentiality of those who reported violations and perceived violations of ethical or legal standards within the Company in accordance with the law.

69. Because of and in direct response to Plaintiff's activity in this regard, Plaintiff suffered adverse employment actions at the behest of Schulman, including, among other things, being denied a retirement package consistent with those paid to employees of similar service time and competence.

70. As a direct, proximate and foreseeable result of Schulman's unlawful retaliation in this regard, Plaintiff has suffered compensatory damages in an amount to be determined at trial.

**COUNT II**
**BREACH OF EMPLOYMENT CONTRACT**

71. Plaintiff incorporates by reference the foregoing paragraphs 1 through 70 as if fully rewritten herein.

72. Plaintiff was party to a contract of employment with Schulman (the "Employment Contract").

73. Implicit in the Employment Contract between Schulman and Plaintiff Friedberg was the obligation on the part of Schulman to deal in good faith with Plaintiff, and to afford her such benefits of employment as were customarily and usually afforded to similarly situated employees.

74. Schulman breached the Employment Contract by, among other things, failing to pay Plaintiff a retirement package consistent with those paid to employees of similar service time and competence.

75. As a direct, proximate and foreseeable result of Schulman's breaches of contract, Plaintiff has suffered compensatory damages in an amount to be determined at trial.

**COUNT III**
**(PROMISSORY ESTOPPEL)**

76. Plaintiff incorporates by reference the foregoing paragraphs 1 through 75 as if fully rewritten herein.

77. Schulman impliedly and expressly promised Plaintiff that, should she perform her job responsibilities in a competent manner, she would be afforded a retirement package consistent with those paid to employees of similar service time and competence.

COPY



78. Plaintiff reasonably relied on that promise to her detriment.

79. Schulman breached that promise.

80. As a direct, proximate and foreseeable result of Schulman's breach, Plaintiff has suffered compensatory damages in an amount to be determined at trial.

**COUNT IV**
**(DEFAMATION)**

81. Plaintiff incorporates by reference the foregoing paragraphs 1 through 80 as if fully rewritten herein.

82. Since her retirement from the Company, Schulman, through its employees, has issued statements intended to create and creating the impression that Plaintiff was terminated for insubordination.

83. Such statements were false and defamatory, and were knowingly published to third parties nonetheless, without privilege to do so, by Schulman.

84. Such publication was, at the very least, negligent on the part of Schulman.

85. As a direct, proximate and foreseeable result of Schulman's defamation in this regard, Plaintiff has suffered harm and damages in an amount to be determined at trial.

WHEREFORE, Plaintiff, Toy Friedberg, prays for judgment as follows:

(1) On Count I, an award of compensatory damages in the amount of not less than $100,000, an award of punitive damages, plus an award of costs, expenses and attorney's fees;

(2) On Count II, an award of compensatory damages in the amount of not less than $100,000, plus an award of costs, expenses and attorney's fees;

(3) On Count III, an award of compensatory damages in the amount of not less than $100,000, plus an award of costs, expenses and attorney's fees;





(4) On Count IV, an award of compensatory damages in the amount of not less than $100,000, an award of punitive damages, plus an award of costs, expenses and attorney's fees; and

(5) Court costs and such other legal or equitable relief in Plaintiff's favor as the Court may deem appropriate.

Thomas G. Kovach (0047213)
Harold E. Farling (0055891)
KOVACH & FARLING CO., LPA
925 Leader Building
526 Superior Avenue East
Cleveland, Ohio 44114-1401
(216) 357-3301
(216) 357-3304 (fax)
tkovach@kflpa.com
hfarling@kflpa.com

Attorneys for Plaintiff






**JURY DEMAND**

Pursuant to Rule 38(B) of the Ohio Rules of Civil Procedure, Plaintiff demands a trial by jury of all issues so triable.

Thomas G. Kovach
One of the Attorneys for Plaintiff